UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

VISTAJET US INC.,                                    Case No.: 1:20-cv-05974 (RA)(GWG)

                Plaintiff,

        -against-

WILD WONDER LLC,

                Defendant.

-----------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND TO DISMISS DEFENDANT'S
<u>COUNTERCLAIMS</u>**


CLYDE & CO US LLP
The Chrysler Building
405 Lexington Avenue, 16th Floor
New York, New York 10174

*Attorneys for Plaintiff VistaJet US Inc.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ..................................................................................3

    A.    The Parties ...........................................................................3

        1.    VJUS ...........................................................................3

        2.    Wild Wonder LLC ...............................................................3

    B.    The Flight Solutions Program Agreement ................................................4

    C.    Wild Wonder's Unjustified Breach of the Agreement ...........................................6

    D.    Flights Continued – and Wild Wonder Flew – During the Pandemic ....................7

    E.    The Pleadings .......................................................................9

ARGUMENT ......................................................................................10

    I.    LEGAL STANDARD ..............................................................10

    II.    VJUS IS ENTITLED TO SUMMARY JUDGMENT ..........................................11

        A.    Wild Wonder Breached the Contract by Refusing to Pay Amounts Due and Owing under the Contract ...........................................11

        B.    Wild Wonder's Defenses Have No Merit .................................................12

            1.    Force Majeure ...............................................................13

            2.    Frustration of Purpose .........................................................15

            3.    Impossibility or Impracticability of Performance ...........................17

    III.    WILD WONDER'S COUNTERCLAIMS SHOULD BE DISMISSED ..............18

        A.    First Counterclaim - Declaratory Judgment ...............................................18

        B.    Second Counterclaim – Unjust Enrichment ...............................................19

        C.    Third Counterclaim – Breach of the Duty of Good Faith and Fair Dealing ...........................................................................20

        D.    Fourth Counterclaim – Money Had and Received ...................................21

CONCLUSION ......................................................................................22

i

# TABLE OF AUTHORITIES

**Page**

*Cases*

*1140 Broadway LLC v. Bold Food, LLC*,
  No. 652674/2020, 2020 WL 7137817 (Sup. Ct., N.Y. Cty., Dec. 3, 2020) ...................... 18

*407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*,
  23 N.Y.2d 275 (1968) ................................................................................................. 15-16

*A + E Television Networks, LLC v. Wish Factory Inc.*,
  No. 15-CV-1189 (DAB), 2016 WL 8136110 (S.D.N.Y. Mar. 11, 2016) .......................... 15

*Aukema v. Chesapeake Appalachia, LLC*,
  904 F. Supp.2d 199 (N.D.N.Y. 2012) ............................................................................... 13

*Canzona v. Atanasio*,
  118 A.D.3d 837 (2d Dep't 2014) ...................................................................................... 11

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................................................... 10

*Constellation Energy Servs. of New York, Inc. v. New Water St. Corp.*,
  146 A.D.3d 557 (1st Dep't 2017) ...................................................................................... 13

*Costoso v. Bank of Am., N.A.*,
  74 F. Supp. 3d 558 (E.D.N.Y. 2015) ........................................................................... 20-21

*F.D.I.C. v. Giammettei*,
  34 F.3d 51 (2d Cir. 1994) .................................................................................................. 10

*F.H. Krear & Co. v. Nineteen Named Trs.*,
  810 F.2d 1250 (2d Cir. 1987) ............................................................................................ 12

*Gao v. JPMorgan Chase & Co.*,
  No. 14 Civ. 4281 (PAC), 2015 WL 3606308 (S.D.N.Y. June 9, 2015) ........................... 19

*Gap Inc. v. Ponte Gadea New York LLC*,
  524 F. Supp.3d 224 (S.D.N.Y. Mar. 8, 2021) .................................................................. 18

*Gargano v. Morey*,
  165 A.D.3d 889 (2d Dep't 2018) ....................................................................................... 21

*Health-Chem Corp. v. Baker*,
  737 F. Supp. 770 (S.D.N.Y. 1990), *aff'd*, 915 F.2d 805 (2d Cir. 1990) ........................... 15

# TABLE OF AUTHORITIES

**Page**

*Cases*

*Hicks v. Baines,*
  593 F.3d 159 (2d Cir. 2010)...............................................................................10

*IDT Corp. v. Morgan Stanley Dean Witter & Co.,*
  12 N.Y.3d 132 (2009) ........................................................................................19

*In re Condado Plaza Acquisition LLC,*
  620 B.R. 820 (Bankr. S.D.N.Y. 2020)...............................................................15

*Kel Kim Corp. v. Central Mkts.,*
  70 N.Y.2d 900 (1987) ........................................................................................13

*Local 1180, Commc'ns Workers of Am., AFL-CIO v. City of New York,*
  392 F. Supp.3d 361 (S.D.N.Y. 2019).......................................................... 11-12

*Matter of Reed Found., Inc. v. Franklin D. Roosevelt Four Freedoms Park, LLC,*
  108 A.D.3d 1 (1st Dep't 2013) ..........................................................................17

*Metro Found. Contractors, Inc. v. Arch Ins. Co.,*
  551 Fed. Appx. 607 (2d Cir. 2014).....................................................................12

*Pettinelli Elec. Co. v. Bd. of Educ. of City of N.Y.,*
  43 N.Y.2d 760 (1977) ........................................................................................15

*Pettinelli Elec. Co., Inc. v. Bd. of Educ. of New York (New-PS 43 & IS 44),*
  56 A.D.2d 520 (1st Dep't 1977) ........................................................................15

*Porter v. Quarantillo,*
  722 F.3d 94 (2d Cir. 2013).................................................................................10

*Raskin v. Wyatt Co.,*
  125 F.3d 55 (2d Cir. 1997).................................................................................10

*Reg'l Econ. Cmty. Action Program, Inc. v. Enlarged City Sch. Dist. of Middletown,*
  18 N.Y.3d 474 (2012) ................................................................................... 21-22

*Rockland Dev. Assocs. v. Richlou Auto Body, Inc.,*
  173 A.D.2d 690 (2d Dep't 1991) .......................................................................16

*Structure Tone, Inc. v. Universal Servs. Grp., Ltd.,*
  87 A.D.3d 909 (1st Dep't 2011) ........................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page**

*Cases*

*Toretto v. Donnelley Fin. Sols., Inc.*,
No. 1:20-cv-2667-GHW, 2022 WL 348412 (S.D.N.Y. Feb. 4, 2022) .............................19

*Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*,
No. 20-CV-5015 (VEC), 2021 WL 3668092 (S.D.N.Y. Aug. 17, 2021) ................... 13-14

*U.S. v. Gen. Douglas MacArthur Senior Vill., Inc.*,
508 F.2d 377 (2d Cir. 1974)...................................................................................16

*Williamsburg Climbing Gym Co., LLC v. Ronit Realty LLC*,
2022 U.S. Dist. LEXIS 2146 (E.D.N.Y. 2022)...................................................16

***Rules, Statutes and Other Authorities***

Federal Rules of Civil Procedure Rule 56 ......................................................................1, 10

IT Cosmetics bosses to leave the brand they created 11 years ago
(cosmeticsbusiness.com)..................................................................................................3

Plaintiff VistaJet US Inc. ("VJUS") respectfully submits this Memorandum of Law in support of its motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP"), for an Order granting VJUS summary judgment on its claims against defendant Wild Wonder LLC ("Wild Wonder"), an order granting VJUS summary judgment on Wild Wonder's counter-claims against it, and awarding VJUS attorneys' fees incurred in connection with the prosecution of this action in accordance with the parties' agreement, and for such other and further relief this Court deems just and proper.

## PRELIMINARY STATEMENT

This is a breach of a contract action for non-payment of approximately $2,000,000 owed by Wild Wonder to VJUS.  VJUS is a charter flight broker and Wild Wonder, a company formed solely for the benefit of its owner, Mr. Paulo Lima, was a VJUS customer.  Pursuant to the parties' contract, VJUS agreed to guarantee the availability of private charter flights to Wild Wonder for a period of three years.  In exchange, Wild Wonder agreed to purchase from VJUS one hundred fifty (150) flight hours per year on a private jet at a fixed rate.  Wild Wonder was to pay for the services in twelve quarterly installments.

By early 2020, VJUS had arranged 87 flights for Wild Wonder passengers, which included Paulo Lima, his family, friends, and colleagues.  On 30 April 2020, *the very same day* Wild Wonder breached the agreement in declining to make the ninth installment payment, VJUS arranged a flight from Newark, NJ to Santa Barbara, CA for Mr. Lima's domestic staff and Mr. Lima himself to fly privately across the country.  Pursuant to the plain language of the contract, this default accelerated the remaining quarterly installments and restricted Wild Wonder's use of the aircraft.

Wild Wonder's logic-defying rationale for breaching the contract mere hours after using VJUS's services is that such services were impossible and could not be performed.  These

1

unsupported, facially absurd claims of force majeure, impossibility, and/or frustration of purpose due to the COVID-19 pandemic have no basis in law or fact.  Force majeure is a complete non-starter.  That clause, which had been specifically negotiated between parties and their counsel, was not triggered by the COVID-19 pandemic.  And even if it had restricted VJUS's ability to arrange flights, which, plainly, it did not, such impediment would need to last 90 continuous days, not the handful of hours between their flight and non-payment.  Wild Wonder's impossibility/frustration of purpose claims are equally misguided.  At no point was VJUS's ability to arrange flights frustrated, destroyed, or impossible to perform.  On the contrary, the evidence herein shows not only that VJUS continued to arrange flights for clients unabated during the pandemic, but that business actually increased as private flying grew in popularity.  The evidence also demonstrates Mr. Lima, his family, and associates continued to fly privately using other brokers in what would have been the final year of the parties' contract had Wild Wonder not breached.  The sheer absurdity of Wild Wonder's position is only amplified by the public policy considerations.  What Wild Wonder seeks is the ability to void a contract should it simply no longer desire to use it, despite agreeing to specific terms for a period of years – by the same logic both individuals and corporations could nullify nearly any contract, large or small, on a whim.  Wild Wonder's self-serving arguments would upend established precedent and void trillions of dollars' worth of contracts from second home mortgages and boat loan payments to office and aircraft leases.

Wild Wonder's counterclaims (for declaratory judgment, unjust enrichment, and breach of the duty of good faith and fair dealing) must fail for the same reasons listed above:  Wild Wonder simply and inexcusably breached its contract, it had and has no viable reason for doing so, and there are no questions for a fact finder to answer.  Thus, VJUS must be granted summary judgment on Wild Wonder's counter claims against it.

## STATEMENT OF FACTS

### A.    The Parties

#### 1.    VJUS

VJUS is an air charter broker with a sales office in New York and a service team in Fort Lauderdale.  It provides its customers guaranteed access to a fleet of aircraft around the globe through a three-year Flight Solutions Program, in which customers pay for that access at an agreed fixed hourly rate.  *See* the accompanying Declaration of Jeffrey C. Fegan ("Fegan Decl."), Exhibit A (Qi Dep.) at 24-26, 33-34, 37-38, 71-72.  As an air charter broker, VJUS can arrange flights with duly licensed air carriers in the United States and the rest of the world to undertake any trip, from a trans-Atlantic flight to a short hop on the West Coast.  *Id.* at 37.

#### 2.    Wild Wonder LLC

Wild Wonder is a company that was formed for the sole benefit of Mr. Paulo Lima ("Lima"), his family, their friends, and associates.  Mr. Lima primarily resides at one of his two homes in Southern California.  Fegan Decl., Exhibit B (Lima Dep.) at 6, 55-56.  After graduating from the University of Michigan, achieving a master's degree from Columbia University, and then working for several years as an investment banker, in 2007, Mr. Lima became CEO of IT Cosmetics, a company started by his wife, Jamie Kern Lima.  *Id.* at 65-66.  In 2016, the couple sold IT Cosmetics to cosmetics giant L'Oreal reportedly for $1.2 billion.[1]  Approximately three years later, in 2019, Mr. Lima and his wife fully divested their interests in IT Cosmetics.  Fegan Decl., Exhibit B at 159.  Mr. Lima now considers himself retired, although he does spend time managing his assets and investments and sitting on the boards of various corporations.  *Id.* at 64-65, 159.

---

[1] *Id.* at 159; *see also* IT Cosmetics bosses to leave the brand they created 11 years ago (cosmeticsbusiness.com).

As the Limas travel by private aircraft, in 2018, Mr. Lima had his attorneys set up Wild Wonder to be the "flight department for my family office." *Id.* at 69-71. The sole purpose of Wild Wonder was to book and manage flights (and pay some bills) for the Lima "family office." *Id.* at 67-69, 74-75, 84.

**B.     The Flight Solutions Program Agreement**

On April 30, 2018, after months of discussions, Wild Wonder "c/o Mr. Paulo Lima" entered into the Flight Solutions Program contract (the "Agreement") at the center of this lawsuit. *Id.* at 83-84, 86, 93; *see also* Fegan Decl., Exhibit C (the Agreement). Mr. Lima and Wild Wonder were represented by counsel during the negotiations. Fegan Decl., Exhibit B at 68-69. The parties' contract was marked as an exhibit during Mr. Lima's deposition, and he acknowledged that it was a true and accurate copy of the agreement Wild Wonder entered into with VJUS. *Id.* at 93-94.

Under the Agreement, which is governed by New York law, Wild Wonder agreed to purchase 150 aircraft flight hours per year on a private jet at a fixed rate of $13,250 per hour, with guaranteed availability, for a period of three years starting on 30 April 2018. Fegan Decl., Exhibit C at 1. Wild Wonder agreed to pay VJUS for the flight hours in twelve quarterly installments of $496,875 starting on 30 April 2018, the last installment to be due on or before 31 January 2021. *Id.*, Key Commercial Terms. This amount was subject to potential yearly rate increases based upon the most recent monthly G20 Consumer Price Index. *Id.* at 7. During the life of the parties' contract VJUS imposed one inflation-related rate increase based upon the Consumer Price Index, in March 2020. Fegan Decl., Exhibit A at 100-01.

The Agreement provided that "Time for payment is of the essence. Late payments are subject to interest at 1% of the outstanding sum per month from the due date until receipt of payment by VistaJet US." *Id.* at 3, Payment. Any "failure to pay proper amount due when due under this Program" is an "Event of Default." *Id.* at 8, Further Provisions, Section 5.1(b), Breach

4

and Default.  Upon an "Event of Default" by Wild Wonder that was not cured, Wild Wonder "shall

not be entitled to use of the Program Aircraft" and its:

> Committed Hours shall be reduced, as liquidated damages and not as a penalty, by
> an amount equal to one twelfth of the then-current Year's Committed Hours for
> each 30 day period or part thereof that such default persists. Any such reduction of
> Committed Hours shall be in addition to VistaJet US's right to claim all sums which
> may be due hereunder and to pursue all other remedies available to it at law or in
> equity.

*Id.*, Further Provisions, Section 5.2, Breach and Default.

Thirty (30) days after any failure by Wild Wonder to make a scheduled payment, all

remaining installment payments would become immediately due and payable:

> All Instalments . . . payable to VistaJet US by [Wild Wonder] under this Program
> shall become immediately due and payable to VistaJet US by [Wild Wonder] in the
> event that any payment due by [Wild Wonder] to VistaJet US under this Program
> remains wholly or partly outstanding for thirty (30) days or more after the date of
> invoice or other payment request issued by VistaJet US to [Wild Wonder] in
> relation to such payment.

*Id.*, Further Provisions, Section 5.4, Breach and Default.

The parties further agreed that, should VJUS be forced to take legal action to recover sums

owed by Wild Wonder under the Agreement, VJUS "reserves the right to re-charge [Wild Wonder]

any costs incurred by VistaJet US in engaging lawyers . . . instructed by VistaJet US to collect any

sums overdue under this Program."  *Id.*, Further Provisions, Section 5.5, Breach and Default.

The Agreement also contains a "Force Majeure" clause which could only be triggered by

VJUS being unable to perform its obligations for a period of ninety (90) days or more:

> VistaJet US shall notify [Wild Wonder] of any event of Force Majeure as defined
> in the Carrier's GTCC [General Terms and Conditions of Carriage] impeding
> VistaJet US's ability to arrange Flight Services with the Program Aircraft for a
> period of 90 days or more, during which time [Wild Wonder]'s obligations under
> this Program shall be suspended until VistaJet US is able to fulfil its obligations
> hereunder. Where the Force Majeure event continues beyond such 90 days, [Wild
> Wonder] may terminate this Program with immediate effect and funds shall be
> refunded as set forth above in Section 2 of Further Provisions.

*Id.*, Further Provisions, Section 4, Force Majeure.

## C.     Wild Wonder's Unjustified Breach of the Agreement

During the first two years of the Agreement, Wild Wonder made the first eight (8) installment payments and took nearly eighty-seven (87) flights arranged by VJUS pursuant to the Agreement.  *See* Fegan Decl., Exhibit D.  However, when the ninth installment payment came due on 30 April 2020, Wild Wonder refused to make the payment.  Fegan Decl., Exhibit A at 107-08. Wild Wonder does not dispute that it did not make the ninth installment payment or any installment payment thereafter.

Although they would not make the payment due 30 April 2020, Mr. Lima and his wife had nonetheless used VJUS to arrange a flight to have their nanny flown from Newark, New Jersey to Santa Barbara, California that very same day.  Fegan Decl., Exhibit B at 152-53.  It is noted that this was *after* Mr. Lima had informed VJUS that Wild Wonder would no longer be making payments due to its supposed inability to use VJUS's services.  *Id.* at 151-52.  Although the COVID-19 pandemic had already come to the United States, the Limas also took a charter flight that day (through a different broker) from Van Nuys, CA to Raleigh, NC for personal reasons.  *Id.* at 155-56.[2]  The Limas returned from North Carolina to California on a private charter flight on 4 May 2020.  Fegan Decl., Exhibit B at 163.  In total, the Limas utilized nearly twenty hours of private jet charter in a seven day period where they now assert it was "impossible" for them to fly.

Wild Wonder's unjustified failure to make the ninth installment payment was an Event of Default under the Agreement, causing all outstanding installments (the ninth, tenth, eleventh, and

---

[2] Mr. Lima contends that VJUS did not arrange a flight for he and his wife that day from California to North Carolina, but the evidence has established that Wild Wonder only requested the flight on twelve hours' notice, far less than the twenty-four hour notice required under the Agreement.  *See* Fegan Decl., Exhibit C at 2, 1.4 Definitions and Basic Tenets.  Although VJUS attempted to accommodate Wild Wonder, a flight could not be arranged within the twelve-hour period demanded by Mr. Lima.  *See* Fegan Decl., Exhibit B at 29-30.  The Agreement provides that VJUS is not obligated to arrange flights within twenty-four hours of the time that the flight is requested by the customer.  *See* Fegan Decl., Exhibit C at 2, 1.4 Definitions and Basic Tenets.

twelfth installments), which totaled $1,987,500, to become immediately due and payable. Pursuant to Section 5.2 of the Agreement, this uncured Event of Default also prevented delinquent Wild Wonder from taking Program flights. Thus, from their breach of 30 April 2020 onward, it was by operation of the contract -- and not because of the pandemic, force majeure, or any alleged inability of VJUS to arrange flights -- that Wild Wonder had no contractual right to utilize VJUS's services under the Agreement.

Given the clear and undisputed facts, it is not surprising that Wild Wonder attempts to bury their *prima facie* breach in some convoluted arguments related to the COVID-19 pandemic. But that is nothing more than a diversion. Wild Wonder's actual motivation appears to have been simpler. In correspondence to VJUS following Wild Wonder's breach, Mr. Lima wrote on Wild Wonder's behalf that:

> Vista has a substantial security deposit of mine already and Vista is, aside from the cruise ship industry, in the worst industry to be in right now. And being foreign owned you don't call for the Cares Act, there is debt on the books and while I won't imply anything, I won't be making any additional prepayments. Anything I pay now is essentially an unsecured, zero interest loan as there is no chance I will use any of the miles I will be paying for in 2020. So to keep paying more money for miles I won't use to be an unsecured creditor, especially when I don't need to, it's not something I'm willing to do?

*Id.* at 135-136.

Wild Wonder made a calculated business decision to breach the Agreement, minimize their putative financial exposure, and fly *ad hoc* charter instead.

### D.    Flights Continued – and Wild Wonder Flew – During the Pandemic

Any reservations Mr. Lima may have had regarding Wild Wonder's "ability to use the contract" or the state of aviation during the COVID-19 pandemic were not rooted in reality. *Id.* at 137. It is undeniable that Wild Wonder was able to use the Agreement, as evidenced by the VJUS-brokered flight from New Jersey to California the Limas arranged for their nanny on 30 April

2020.  *Id.* at 152-53, 155-56, 163.  Had Wild Wonder not breached the Agreement, it would have had guaranteed availability under the Agreement for their 4 May 2020 flight, as well and every subsequent charter flight they took during what would have been year three of their contract.  The President of VJUS, Leona Qi, whose primary responsibility was sales of the Flight Solutions Program, testified that although government agencies issued health guidelines and regulations for aircraft operators when the COVID-19 pandemic started, they did not impose any restrictions that would prohibit a VJUS customer from traveling on VJUS-arranged flights.  Fegan Decl., Exhibit A at 120, 122, 157.  VJUS's business continued uninterrupted.  At no point did it shut down.  Its teams were able 24/7/365 to provide flight services and would arrange thousands of flights for its customers during the pandemic.  *See* Fegan Decl., Exhibit E.  In fact, VJUS arranged more than a thousand flights for its customers at the height of the COVID pandemic, and by the third quarter of 2021 <u>VJUS arranged more than nine thousand (9,000) flights</u>.  Fegan Decl., Exhibit A at 168-69.

More widely, commercial flights, both international and domestic, continued unabated during the pandemic.  Planes were not grounded:  the United States government never prohibited commercial airlines or private aircraft operators from operating flights within the United States or internationally because of the pandemic.  *Id.* at 160-61.  In fact, millions of domestic and international commercial flights continued during the pandemic.  *Id.* at 156-57.  Indeed, the Limas themselves continued to fly during the pandemic.  On 3 September 2020, the Limas took a charter flight from California to Coatesville, PA, where the Limas own a house, for a family event.  *See* Fegan Decl., Exhibit B at 164-66.  After staying a few days, they took a charter flight back to California on 6 September 2020.  *Id.* at 165-67.  Later that year and into the next, Ms. Kern-Lima flew private in connection with a book launch:  she flew round-trip from California to Tennessee

in October 2020; and round-trip California to Florida in November 2020 and again in February/March 2021.  *Id.* at 172-73, 175.  But for Wild Wonder's breach, VJUS would have been ready, willing, and able to arrange all of these flights.

## E.     The Pleadings

Because Wild Wonder has refused to honor the Agreement, VJUS was forced to file its Complaint in which it seeks the principal amount of $1,987,500 (the total of the ninth, tenth, eleventh, and twelfth installment amounts) plus interest, costs and attorneys' fees.  *See* Complaint, Dkt. No. 4 at ¶¶ 19-29.

In its Answer, Wild Wonder did not deny non-payment but rather asserted the affirmative defenses of force majeure, impossibility, frustration of purpose, and commercial impracticability. *See* Dkt No. 11 at ¶¶ 12, 23-24 and First, Second, Third, and Fourth Affirmative Defenses.  Wild Wonder also asserted four counterclaims: (1) for a declaration that it is excused from performance based upon its affirmative defenses (*id.* at ¶ 31); (2) for unjust enrichment and recovery of $1,250,000 (representing the approximate value of Accrued Hours and a security deposit) (*id.* at ¶¶ 23, 24, 32-36); (3) for breach of the duty of good faith and fair dealing on the ground that VJUS "refused to make any commercially reasonable efforts to ensure that" Wild Wonder retained the benefits of the Agreement (*id.* at ¶¶ 44-46); and (4) for the same amount for "money had and received."  *Id.* at ¶¶ 44-46.

# ARGUMENT

## I.   LEGAL STANDARD

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact with respect to the claims asserted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *accord Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013).  "Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense–on which the defendant bears the burden of proof at trial–a plaintiff 'may satisfy its Rule 56 burden by showing 'that there is an absence of evidence to support [an essential element of] the [non-moving party's] case.'" *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (alteration in original) (quoting *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d 30, 32 (2d Cir. 1993)).  "While whatever evidence there is to support an essential element of an affirmative defense will be construed in a light most favorable to the non-moving defendant, there is 'no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 323).  "After all, in cases where there is an absence of evidence to support an essential element of a defense, with respect to that defense 'there can be "no genuine issue as to any material fact" since a complete failure of proof concerning an essential element of the [defendant's affirmative defense] necessarily renders all other facts immaterial.'" *Id.* at 54-55 (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 323).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original) (internal quotations and citations omitted).

## II.    VJUS IS ENTITLED TO SUMMARY JUDGMENT

### A.    Wild Wonder Breached the Contract by Refusing to Pay Amounts Due and Owing under the Contract

In New York, "[t]he essential elements of a breach of contract cause of action are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." *Canzona v. Atanasio*, 118 A.D.3d 837, 838-39 (2d Dep't 2014) (internal citations and quotations omitted). "Moreover, the plaintiff's allegations must identify the provisions of the contract that were breached." *Id.* at 839 (internal citations and quotations omitted).

Each breach of contract element is satisfied here.  First, the parties do not dispute that the Agreement exists and is a valid contract.  Second, VJUS performed its obligations under the Agreement and Wild Wonder can present no evidence to the contrary.[3]  During the period of the first eight installment payments, VJUS arranged eighty-seven flights for Wild Wonder under the Agreement.  In fact, *right until Wild Wonder defaulted*, VJUS performed it obligations, having arranged a 30 April 2020 flight for the Lima's nanny from New Jersey to California.  Third, Wild Wonder's non-payment was an "Event of Default" under Further Provisions, Section 5.1(b) and a clear breach of the Agreement.  Fourth and finally, VJUS has been damaged by Wild Wonder's refusal to pay amounts owed under the Agreement.

Not only is VJUS entitled to the principal amount of its damages, plus interest, under the Agreement, it is also entitled to its attorneys' fees incurred "in engaging lawyers . . . instructed by VistaJet US to collect any sums overdue under this Program."  Fegan Decl., Exhibit C, Further Provisions, Section 5.5, Breach and Default.  Under the "American Rule," there is a presumption

---

[3] As mentioned earlier, although Wild Wonder claims that VJUS did not manage to arrange a flight from California to North Carolina on 30 April 2020, Wild Wonder admits that it did not give VJUS the 24 hour notice required under the Agreement.  *See* Wild Wonder Answer, Dkt. No. 11 at ¶¶ 17-18, *see also* Fegan Decl., Exhibit C at 1.

that each party is responsible for its own attorneys' fees unless a statute or contract provides otherwise. *See Local 1180, Commc'ns Workers of Am., AFL-CIO v. City of New York*, 392 F. Supp.3d 361, 377 (S.D.N.Y. 2019). Contract provisions addressing the recovery of attorneys' fees are valid and enforceable under New York law, and courts "will order the losing party to pay whatever amounts have been expended . . . so long as those amounts are not unreasonable." *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1263 (2d Cir. 1987); *accord Metro Found. Contractors, Inc. v. Arch Ins. Co.*, 551 Fed. Appx. 607, 610 (2d Cir. 2014) (summary order).

Wild Wonder and VJUS agreed upon the language of their contract after face-to-face meetings, a formal written proposal, and attorney review. There can be no dispute that the portion of that contract relating to attorneys' fees was accepted after a full and fair review by Wild Wonder. This portion of the parties' contract is also related to specific potential damages, as the parties agreed in advance upon the price of the services which would be provided. Further, it is beyond clear that VJUS complied with its obligations under the contract and that Wild Wonder did not, even making use of VJUS's services deciding that it would make no further payments (despite its argument that air travel was "impossible" under the circumstances). Accordingly, VJUS is entitled to the reasonable attorneys' fees incurred in prosecuting this action to recover the amounts owed by Wild Wonder.

## B.   Wild Wonder's Defenses Have No Merit

Wild Wonder erroneously contends that its breach should be excused under the doctrines of force majeure, frustration of purpose, impossibility and/or commercial impracticability. However, for the reasons discussed below, these affirmative defenses, for which Wild Wonder bears the burden of proof, are not valid.

### 1.    Force Majeure

Wild Wonder's force majeure defense fails because the parties did not expressly include the circumstances at issue in this case as a potential force majeure event in the force majeure clause of the Agreement.

"Generally, once a party to a contract has made a promise, that party must perform or respond in damages for its failure, even when unforeseen circumstances make the performance burdensome[.]"  *See Kel Kim Corp. v. Central Mkts.*, 70 N.Y.2d 900, 902 (1987).  "The primary purpose of force majeure is to 'relieve a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated.'"  *See Aukema v. Chesapeake Appalachia, LLC*, 904 F. Supp.2d 199, 210 (N.D.N.Y. 2012) (quoting *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985).  However, "'[W]hen the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure.'" *Constellation Energy Servs. of New York, Inc. v. New Water St. Corp.*, 146 A.D.3d 557, 558 (1st Dep't 2017) (quoting *Route 6 Outparcels, LLC v. Ruby Tuesday, Inc.*, 88 A.D.3d 1224, 1225 (3d Dep't 2011)).  "[C]ontractual *force majeure* clauses . . . provide a . . . narrow defense. Ordinarily, only if the *force majeure* clause specifically includes the event that actually prevents a party's performance will that party be excused."  *Kel Kim Corp.*, 70 N.Y.2d at 902-03 (citing *United Equities Co. v. First Nat'l City Bank*, 41 N.Y.2d 1032 (1977)).  *See also Aukema*, 904 F. Supp.2d at 210 ("[A] force majeure clause must include the specific event that is claimed to have prevented performance.").  Notably, courts have recently declined to excuse parties from their contractual obligations due to the COVID-19 pandemic.  *See, e.g., Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 20-CV-5015 (VEC), 2021 WL 3668092, at *14 (S.D.N.Y. Aug. 17, 2021) (in the context of the mutual mistake defense, the Court held that "the parties' failure to

anticipate the onset of a worldwide pandemic that would have an impact on their deal is a mistaken, if understandable, assumption about the future; it does not overcome the heavy presumption that the plain language of a contract captures the complete intentions of the parties.").

Here, the parties have specifically defined the contours of force majeure in the force majeure clause of the Agreement.  The clause provides:

> VistaJet US shall notify [Wild Wonder] of any event of Force Majeure as defined in the Carrier's GTCC [General Terms and Conditions of Carriage] impeding VistaJet US's ability to arrange Flight Services with the Program Aircraft for a period of 90 days or more, during which time [Wild Wonder]'s obligations under this Program shall be suspended until VistaJet US is able to fulfil its obligations hereunder. Where the Force Majeure event continues beyond such 90 days, [Wild Wonder] may terminate this Program with immediate effect and funds shall be refunded as set forth above in Section 2 of Further Provisions.

Fegan Decl., Exhibit C at 8, Further Provisions, Section 4, Force Majeure.

Thus, under the plain language of this bespoke, negotiated Agreement, a force majeure event must impede VJUS's "ability to arrange Flight Services with the Program Aircraft for a period of 90 days or more," The issue is not whether Wild Wonder sought to take flights during this period, but whether VJUS determined itself unable to arrange flights for Wild Wonder for a period of 90 days or more. Clearly that was not the case, and Wild Wonder admitted as much during its deposition.  Fegan Decl., Exhibit B at 107.  VJUS did not declare a force majeure event to Wild Wonder once the COVID-19 pandemic began.  To the contrary, it informed Wild Wonder that it was perfectly capable of arranging flights during the pandemic.  And that is exactly what the record shows.  VJUS consistently arranged flights for Wild Wonder up until the latter breached the Agreement *on the very day it utilized a Program Aircraft*, and, at all times, VJUS was actively arranging flights for its other clients from 2020 onward.  *See* Fegan Decl., Exhibit E.

It certainly follows that Wild Wonder has not – and cannot – identify any 90-day period in which VJUS's ability to arrange flights for Wild Wonder was impeded.  Reality paints quite a

different picture.  VJUS arranged flights throughout the pandemic and benefitted from the growth

of the private aviation industry, which became known as one of the safest ways to travel.

But one need not go so far.  Wild Wonder is foreclosed from arguing that the COVID-19

pandemic was a force majeure event or otherwise impeded their flying because, as clearly set forth

in Section 5.2 of the Agreement, *Wild Wonder was not entitled to utilize their Program following*

*their breach*.  For these reasons, force majeure is not a viable defense for Wild Wonder.

### 2.   Frustration of Purpose

The frustration of purpose doctrine "offers a defense against enforcement of a contract

when the reasons for performing the contract cease to exist due to an unforeseeable event which

destroys the reasons for performing the contract."  *Structure Tone, Inc. v. Universal Servs. Grp.,*

*Ltd.*, 87 A.D.3d 909, 912 (1st Dep't 2011).  "In order to be invoked, the frustrated purpose must

be so completely the basis of the contract that, as both parties understood, the transaction would

have made little sense."  *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 839-40 (Bankr.

S.D.N.Y. 2020).  In other words, "the inducing circumstance which no longer exists must be the

foundation of the contract."  *Pettinelli Elec. Co., Inc. v. Bd. of Educ. of New York (New-PS 43 &*

*IS 44)*, 56 A.D.2d 520, 521 (1st Dep't 1977) (internal citations and quotations omitted), *aff'd sub*

*nom. Pettinelli Elec. Co. v. Bd. of Educ. of City of N.Y.*, 43 N.Y.2d 760 (1977).  Importantly, "a

party is not excused from a contract simply because it becomes more economically difficult to

perform."  *A + E Television Networks, LLC v. Wish Factory Inc.*, No. 15-CV-1189 (DAB), 2016

WL 8136110, at *13 (S.D.N.Y. Mar. 11, 2016) (internal citations omitted).  "[A] change in market

conditions or an increase in the cost of performance are insufficient grounds to assert" New York's

frustration of purpose defense.  *See Health-Chem Corp. v. Baker*, 737 F. Supp. 770, 776 (S.D.N.Y.

1990), *aff'd*, 915 F.2d 805 (2d Cir. 1990).  *See also 407 E. 61st Garage, Inc. v. Savoy Fifth Ave.*

*Corp.*, 23 N.Y.2d 275, 281-82 (1968) "The doctrine of frustration of purpose does not apply unless

the frustration is substantial," and it is therefore "not enough that the transaction has become less profitable for the affected party or even that [the affected party] will sustain a loss." *See Williamsburg Climbing Gym Co., LLC v. Ronit Realty LLC*, 2022 U.S. Dist. LEXIS 2146, at *8 (E.D.N.Y. 2022) (finding that emergency public safety measures undertaken during COVID-19 pandemic making defendant's business model unprofitable were "not enough" to excuse it from its contractual obligations under doctrine of frustration of purpose); *see also Rockland Dev. Assocs. v. Richlou Auto Body, Inc.*, 173 A.D.2d 690, 691 (2d Dep't 1991).  In sum, discharge of a party's duties under a contract pursuant to the frustration of purpose doctrine is "limited to instances where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party." *See U.S. v. Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974).

Here, the Agreement was for the provision of air charter services.  That inducing circumstance was not destroyed by the pandemic.  VJUS's broker operations and its ability to arrange flights were not impeded.  VJUS remained willing and able to arrange private charter flights for its customers, including Wild Wonder – and it did just that.  The fact that the business and/or recreational travel plans of Wild Wonder's principal may have been affected by the pandemic did not frustrate the purpose of the Agreement, which was for VJUS to guarantee the availability of charter flights to Wild Wonder during the term of the Agreement.  Putting aside the fact that Wild Wonder could and did fly, this guarantee is of no less significant value to VJUS clients *even if they are not actively flying* for a period in their three year term.  If there is an emergency or unexpected trip, and the client or their family, friends, and colleagues need to travel, VJUS is always there to arrange a flight and provide lift.  That's the nature of the offering.

Accordingly, the frustration of purpose defense does not apply to these facts.

### 3.     Impossibility or Impracticability of Performance

The defense of impossibility or impracticability of performance, which is also applied narrowly, excuses performance "only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible," and requires that "the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract.'" *See Matter of Reed Found., Inc. v. Franklin D. Roosevelt Four Freedoms Park, LLC*, 108 A.D.3d 1, 4 (1st Dep't 2013).

For the reasons previously stated, the evidence demonstrates that the subject matter of the Agreement – the provision by VJUS of guaranteed availability to charter flights within the terms of the Agreement – was not destroyed or made objectively impossible due to the COVID-19 pandemic.  Evidence of this includes that Wild Wonder had VJUS arrange a flight for the Lima's nanny on 30 April 2020 and that VJUS's operations continued unabated, as it arranged thousands of flights for its customers during the pandemic.  *See* Fegan Decl., Exhibit E.  Not only did VJUS's operations continue, but nothing prevented Wild Wonder from using the private charter services during the pandemic and the record indicates that its principals did so, both in 2020 and 2021.  On a general level it is important to understand that the contract is designed to provide the purchaser with the guaranteed ability of a service over a specific period of time; the availability provided is not contingent upon the ebbs and flows of the purchaser's desire to use it or even the purchaser's physical ability to use it.  Despite the fact that Wild Wonder did in fact make use of VJUS's services after claiming an inability to do so, the most important factor for the Court to consider in this regard is VJUS's ability to arrange flights for its customers – this was clearly not impeded and it was certainly possible for Wild Wonder to fly through VJUS at all times the contract was in effect.

17

Notably, New York courts have thus far rejected the contention that the COVID-19 pandemic presents a special circumstance under the impossibility and/or frustration of purpose doctrines. *See Gap Inc. v. Ponte Gadea New York LLC*, 524 F. Supp.3d 224, 234 (S.D.N.Y. Mar. 8, 2021) (neither the pandemic nor New York's blanket prohibition of non-essential business frustrated the purpose of a commercial lease); *see also 1140 Broadway LLC v. Bold Food, LLC*, No. 652674/2020, 2020 WL 7137817, at *2 (Sup. Ct., N.Y. Cty., Dec. 3, 2020) (in a commercial landlord-tenant case, there was no "destruction of the subject matter" of the commercial lease due to the COVID-19 pandemic because the office space leased was not destroyed).  The courts' reasoning in this regard is obvious – were a party able to relieve itself of contractual obligations simply because market conditions changed after a contract is signed, no contract is safe.  No purchase of a residence, no purchase of commercial property, and no rental of a property, airplane, yacht, or car could go forward without being subject to post-agreement whims of the purchaser. For the foregoing reasons, none of Wild Wonder's affirmative defenses apply or excuse Wild Wonder's breach of the Agreement.

## III.    WILD WONDER'S COUNTERCLAIMS SHOULD BE DISMISSED

Each of Wild Wonder's counterclaims (for declaratory judgment, unjust enrichment, breach of the duty of good faith and fair dealing, and money had and received) should be dismissed for the following reasons.

### A.    First Counterclaim - Declaratory Judgment

Wild Wonder's counterclaim, which seeks a declaration that Wild Wonder is excused from performance on the bases of its affirmative defenses, must fail because for the reasons discussed above and below, the affirmative defenses are meritless and inapplicable.

**B.      Second Counterclaim – Unjust Enrichment**

Wild Wonder's counterclaim for unjust enrichment, which seeks the amount of its security deposit and the value of "unused" flight hours, fails for at least two reasons.

First, an unjust enrichment claim is not available where, as here, the parties do not dispute that there is a valid and enforceable written contract governing the subject matter of the dispute. *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."); *see also Gao v. JPMorgan Chase & Co.*, No. 14 Civ. 4281 (PAC), 2015 WL 3606308, at *5 (S.D.N.Y. June 9, 2015) (unjust enrichment claim was not barred by existence of written contract where plaintiffs brought claim "in the alternative, alleging that the contract [wa]s not enforceable.").

Second, even if a claim for unjust enrichment was available to Wild Wonder (it is not), Wild Wonder cannot satisfy its elements.  "To state a claim for unjust enrichment in New York, a plaintiff must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution."  *Toretto v. Donnelley Fin. Sols., Inc.*, No. 1:20-cv-2667-GHW, 2022 WL 348412, at *17 (S.D.N.Y. Feb. 4, 2022).  Here, none of the foregoing elements are satisfied because, upon Wild Wonder's default, VJUS simply exercised its contractual rights and thus could not have been "unjustly enriched."   Upon Wild Wonder's breach, VJUS deducted Wild Wonder's security deposit as liquidated damages, as it was entitled to do under the Agreement, and also credited Wild Wonder for that deduction.  *See* Fegan Decl., Exhibit A at 111 and Exhibit C at 6.  VJUS was also entitled to reduce Wild Wonder's Committed Hours over time as Wild Wonder never cured its default:

> Committed Hours shall be reduced, as liquidated damages and not as a penalty, by an amount equal to one twelfth of the then-current Year's Committed Hours for each 30 day period or part thereof that such default persists. Any such reduction in Committed Hours shall be in addition to VistaJet US' right to claim all sums which may be due hereunder and to pursue all other remedies available to it at law or in equity.

Fegan Decl., Exhibit WC, Further Provisions, Section 5.2, Breach and Default.  Accordingly, VJUS was not unjustly enriched due to the fact that Wild Wonder forfeited flight hours because of its breach, in accordance with the terms of the Agreement.

## C.     Third Counterclaim – Breach of the Duty of Good Faith and Fair Dealing

The facts demonstrate that VJUS upheld its end of the Agreement and Wild Wonder breached the Agreement without justification.  Faced with that simple reality, Wild Wonder resorts to a vague allegation that VJUS "has refused to make any commercially reasonable efforts to ensure that Defendant can retain the benefits for which it entered the Agreement."  Wild Wonder's Answer, Dkt. 11 at ¶ 41.  Although it is difficult to know exactly what that is intended to mean, the facts demonstrate that Wild Wonder retained the benefits of its bargain until it breached the Agreement.  VJUS did not breach the Agreement or any implied covenant within the Agreement.  That being said, it is clear that by contrast, Wild Wonder was using its breach as leverage to negotiate what it thought would be a better deal with VJUS by indicating it was concerned VJUS might go bankrupt because of the COVID-19 pandemic.  Fegan Decl., Exhibit B at 136.  Mr. Lima actually describes Wild Wonder's post breach correspondence with VJUS in exactly those terms, stating "What I wanted to do was just come to an agreement while I still had some leverage. . . . All of this was negotiating to get what I originally wanted, which was a one-year extension or at least an extension for as long as the State of California was locked down for."  *Id.* at 138-39.

Although the implied covenant of good faith and fair dealing may be breached "where a party has complied with the literal terms of the contract, but has done so in a way that undermines

the purpose of the contract and deprives the other party of the benefit of the bargain" (*see Costoso v. Bank of Am., N.A.*, 74 F. Supp. 3d 558, 572 (E.D.N.Y. 2015)), there is no evidence that VJUS attempted to undermine the purpose of the contract or somehow deprive Wild Wonder of the benefit of its bargain.  Wild Wonder was "deprived" of the benefit of its bargain because Wild Wonder breached the Agreement by failing to pay.  Had Wild Wonder made the scheduled payments, it would have retained the benefits of its bargain, i.e., VJUS would have continued to make flights available to Wild Wonder under the Agreement.  There is no evidence in the record to the contrary and, therefore, Wild Wonder's third counterclaim should be dismissed.

### D.      Fourth Counterclaim – Money Had and Received

Wild Wonder's fourth counterclaim, for "money had and received," fails for the same reasons as its counterclaim for unjust enrichment.   As stated above, the parties' contract was subject to extended negotiations, involving meetings, a formal written proposal, a response to that proposal, and attorney review.  The terms of the contract are completely clear and they are exactly what Wild Wonder bargained for.  This precludes any appeal to the quasi-contractual relief Wild Wonder seeks in its "Money Had and Received" counter-claim.

"A cause of action for money had and received is similar to a cause of action to recover damages for unjust enrichment, the essence of which is that one party has received money or a benefit at the expense of another."  *Gargano v. Morey*, 165 A.D.3d 889, 891 (2d Dep't 2018) (internal citations omitted).  "A cause of action sounding in money had and received is based upon quasi contract. Its essential elements are (1) the defendant received money belonging to the plaintiff, (2) the defendant benefitted from receipt of the money, and (3) under principles of equity and good conscience, the defendant should not be permitted to keep the money."  *Id.* (internal quotations and citations omitted).  As with a claim for unjust enrichment, a claim for money had and received is not available where the parties have a contract on the same subject matter.  *See*

21

*Reg'l Econ. Cmty. Action Program, Inc. v. Enlarged City Sch. Dist. of Middletown*, 18 N.Y.3d 474, 479 (2012) ("Although a cause of action for money had and received is an action based on an implied contract, this designation is 'a misnomer because it is not an action founded on contract at all; it is an obligation which the law creates *in the absence of agreement* when one party possesses money that in equity and good conscience he ought not to retain and that belongs to another.") (emphasis added) (further citations omitted).

Because the parties had the Agreement in place, Wild Wonder's claim for money had and received must be dismissed.  Even if the claim was available, Wild Wonder could not satisfy its elements for the same reasons it could not prove unjust enrichment, as discussed in Point III.C. above.

<u>**CONCLUSION**</u>

For the reasons set forth above, plaintiff VJUS respectfully requests that the Court issue an Order granting VJUS summary judgment, awarding VJUS its damages, including costs and the attorneys' fees incurred by VJUS in the prosecution of this action, dismissing Wild Wonder's counterclaims, and for such other and further relief this Court deems just and proper.

Dated: New York, New York
          June 16, 2022

Respectfully submitted,

CLYDE & CO US LLP

By: */s/ Jeffrey C. Fegan*
          Jeffrey C. Fegan
The Chrysler Building
405 Lexington Avenue, 16th Floor
New York, New York 10174
Tel: (212) 710-3900
Fax: (212) 710-3950
Email: jeffrey.fegan@clydeco.us

*Attorneys for Plaintiff VistaJet US Inc.*