UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
VISTAJET US INC.,

                                          Case No.: 20-cv-05974 (RA) (GWG)

                     Plaintiff,

       v.

WILD WONDER LLC,

                     Defendant.
--------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SILVERMANACAMPORA LLP**
*Attorneys for Defendant Wild Wonder LLC*
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
David J. Mahoney

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 4

   1.  Wild Wonder and the Limas Generally .................................................................. 4

   2.  VistaJet US Generally ............................................................................................. 4

   3.  The "Flight Services Agreement" Generally .......................................................... 6

   4.  Events of March-April 2020 ................................................................................... 7

APPLICABLE STANDARDS ............................................................................................ 10

ARGUMENT ..................................................................................................................... 12

I.    DECLARATORY JUDGMENT IS APPROPRIATE BASED UPON
      "FRUSTRATION OF PURPOSE" ...................................................................... 13

   i.  The Effects of the COVID-19 Pandemic Were both "Unforeseeable"
       and "Substantially" Destroyed or Undermined the Agreement's Purpose
       for One of the Contracting Parties ....................................................................... 14

   ii.  The Law Recognizes the Force and Effect of Government Intervention
        to "Frustrate" A Private Contract, and The Court Should Do So Here
        Based On the Facts ................................................................................................ 17

   iii.  Mere Economic "Changed Circumstances" Frustration Cases Distinguished ................. 20

   iv.  Equitable Considerations and Absurdity .......................................................... 23

CONCLUSION ................................................................................................................... 25

2814040v2 / 068088.2 / WBERGESCH

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*850 Third Ave. Owner, LLC v. Discovery Commc'ns, LLC*,
2022 NY Slip Op 03171 (1st Dept. May 12, 2022) ................................................................ 18

*Am. Commercial Lines LLC v. Water Quality Ins. Syndicate*,
679 F. App'x 11 (2d Cir. 2017) ................................................................ 11-12, 23

*Baldwin v. EMI Feist Catalog, Inc.*,
805 F.3d 18 (2d Cir. 2015) ................................................................ 11

*Brach v. Newsom*,
6 F.4th 904 (U.S. 9th Cir. 2021) ................................................................ 3, 16

*Brown v. Webber*,
No. 18 CV 09618 (NSR), 2022 U.S. Dist. LEXIS 69374
(S.D.N.Y. Apr. 14, 2022) ................................................................ 17-18

*CAI Rail, Inc. v. Badger Mining Corp.*,
2021 U.S. Dist. LEXIS 32564 (S.D.N.Y. Feb. 22, 2021) ................................................ 3, 21-22

*Common Sense Party v. Padilla*,
469 F. Supp. 3d 951 (E.D. Cal. 2020) ................................................................ 15

*Culinary Studios, Inc. v. Newsom*,
517 F. Supp. 3d 1042 (E.D. Cal. 2021) ................................................................ 14

*E TV Networks, LLC v. Wish Factory*,
No. 15-CV-1189 (DAB), 2016 U.S. Dist. LEXIS 33361
(S.D.N.Y. Mar. 11, 2016) ................................................................ 13

*Embraer S.A. v. Dougherty Air Tr., LLC*,
348 F. Supp. 3d 246 (S.D.N.Y. 2018) ................................................................ 10-11, 11

*Gander Mt. Co. v. Islip U-Slip LLC*,
923 F. Supp. 2d 351 (N.D.N.Y. 2013) ................................................................ 12, 20-21

*Haskins v. Doe*,
No. 16-CV-8525 (RA), 2019 U.S. Dist. LEXIS 150614
(S.D.N.Y. Sep. 4, 2019) ................................................................ 11

*Health-Chem Corp. v. Baker*,
737 F. Supp. 770 (S.D.N.Y. 1990) ................................................................ 20

*In re Condado Plaza Acquisition LLC*,
620 B.R. 820 (Bankr. S.D.N.Y. 2020) .................................................................. 13

*In re Fontana D'Oro Foods*,
122 Misc. 2d 1091, 472 N.Y.S.2d 528 (Sup. Ct. Richmond, Dec. 22, 1983) ........................ 21

*JN Contemp. Art LLC v. Phillips Auctioneers LLC*,
29 F.4th 118 (2d Cir., March 23, 2022) ................................................................. 17

*Johnson v. AGS CJ Corp.*,
No. 17-CV-7438 (RA), 2020 U.S. Dist. LEXIS 61451 (S.D.N.Y. Apr. 7, 2020) .................. 11

*L. N. Jackson & Co. v. Royal Norwegian Gov't*,
177 F.2d 694 (2d Cir. 1949) ................................................................................. 19

*Mastrovincenzo v. City of N.Y.*,
435 F.3d 78 (2d Cir. 2006) .................................................................................. 23

*Matter of City of Troy* (Troy Uniformed Firefighters Ass'n, Local 86 IAFF, AFL-CIO),
2022 NY Slip Op 02174, 203 A.D.3d 1523, 166 N.Y.S.3d 285
(3rd Dept. March 31, 2022) ................................................................................. 18

*Mawhinney v. Millbrook Woolen Mills*,
231 N.Y. 290, 299-300 (1921) ............................................................................. 19

*Mission Fitness Ctr., LLC v. Newsom*,
No. 2:20-CV-09824-CAS-KSx, 2021 U.S. Dist. LEXIS 89055
(C.D. Cal. May 10, 2021) ................................................................................... 15

*Newmont Mines v. Hanover Ins. Co.*,
784 F.2d 127 (2d Cir. 1986) ............................................................................... 23

*NTS W. USA Corp. v. 605 Fifth Prop. Owner, LLC*
No. 20-CV-6692 (CS), 2021 U.S. Dist. LEXIS 171240 (S.D.N.Y. Sep. 9, 2021) .......... 13, 14

*Overseas Private Inv. Corp. v. Gerwe*,
No. 12-CV-5833 (RA), 2016 U.S. Dist. LEXIS 40752 (S.D.N.Y. Mar. 28, 2016) ............... 11

*Protégé Rest. Partners LLC v. Sentinel Ins. Co.*,
517 F. Supp. 3d 981 (N.D. Cal. 2021) ................................................................... 14

*Sage Realty Corp. v. Jugobanka, D.D.*,
95 Civ. 0323 (RJW), 1997 U.S. Dist. LEXIS 9301 (S.D.N.Y. July 2, 1997) ...................... 12

*Seaplane Adventures v. Cty. of Marin, No. C 20-06222 WHA*,

2814040v2 / 068088.2 / WBERGESCH

2021 U.S. Dist. LEXIS 214648 (N.D. Cal. Nov. 5, 2021) ................................................. 3, 16

*Structure Tone, Inc. v. Universal Servs. Grp., Ltd.*,
2010 NY Slip Op 31384(U) (Sup. Ct. NY, June 3, 2010) ...................................... 20

*Sunstone Hotel Inv'rs v. Endurance Am. Specialty Ins. Co.*,
No. SACV 20-02185-CJC (ICESx), 2022 U.S. Dist. LEXIS 111147
(C.D. Cal. June 15, 2022) .......................................................................... 14

*United States v. Gen. Douglas MacArthur Senior Vill., Inc.*,
508 F.2d 377 (2d Cir. 1974) ........................................................... 12, 13

*Vida Skin Care, Inc. v. Sentinel Ins. Co.*,
No. 2:21-cv-07997-MCS-SK, 2022 U.S. Dist. LEXIS 82670
(C.D. Cal. May 6, 2022) ............................................................................. 15

*W. K. Ewing Co. v. N.Y. State Teachers' Ret. Sys.*,
14 A.D.2d 113, 218 N.Y.S.2d 253 (3rd Dept. 1961) ............................... 21

*Wright v. Goord*,
554 F.3d 255 (2d Cir. 2009) ..................................................................... 11

**Statutes**

28 U.S.C. 2201 ............................................................................................ 10

Gov't Code § 8665 ...................................................................................... 15

**Other**

FRCP Rule 56 ............................................................................................. 11

Rule 60(b)(6) .............................................................................................. 18

2814040v2 / 068088.2 / WBERGESCH

## PRELIMINARY STATEMENT

Defendant Wild Wonder LLC ("Wild Wonder" or "Defendant") respectfully submits this memorandum of law in support of its motion pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 56, for summary judgment in favor of Defendant, in connection with Defendant's first counter-claim cause of action seeking a declaratory judgment. Wild Wonder submits that no triable issue of fact exists, because the undisputed facts demonstrate the underlying purpose of the contract at issue in this action was "frustrated" as a matter of law.

This action presents yet another iteration of the COVID-19 Pandemic's impact upon pre-existing life, commitments, and particular relationships between private parties, as affected by the pandemic itself, and the society-wide, government-lead response(s). This Court and others have, since the beginning of the pandemic, dealt with all manner of legal questions and types of controversies affected by COVID, and courts in general have been forced to develop law in real-time. This case involves a private contract of limited scope. The question presented is whether, even if VJUS was "able to perform" by providing up to 150 hours of private jet flight to Wild Wonder, was that contract frustrated if governmental restrictions precluded Wild Wonder from using the flight hours for which it paid. The law provides that in limited extraordinary circumstances, a sufficiently unforeseen and beyond-the-pale event undermines and "frustrates" the original predicate purpose of the contract. That "frustration" can, and on these facts here, should render a given contract unenforceable, and give rise to rescission of the contract.

Wild Wonder respectfully submits that its purpose for entering into the contract at issue here was demonstrably "frustrated" by Covid-related travel restrictions and that as a matter of law, the contract was or ought to have been considered legally frustrated and unenforceable no later than April 30, 2020. During the period leading up to that date, it is undisputed that Wild Wonder's

1

principal Paulo Lima ("Lima") contacted VJUS's principal, and the communications exchanged reflected that both parties recognized the circumstances of the COVID-19 Pandemic were impacting, and had already impacted the core nature of engaging in travel and utilizing flight hours. Neither party could have projected  when the COVID related governmental restrictions would abate or resolve, except to venture rankly speculative guesses (which, with two years of hindsight) now appear absurd.[1] VJUS at that time had already *themselves* imposed alterations and additions to terms and conditions of service, due to COVID. VJUS's communications to Wild Wonder's principal confirm that VJUS generally acknowledged that COVID had impacted the normal usage of the flight services anticipated to be provided by the Agreement. However, they refused to modify the contract with Wild Wonder, or at minimum, to provide some manner of guarantee that the events and circumstances of COVID, would not frustrate Wild Wonder's core purpose of *flying at least for 150 hours in a year*. Instead, they both then, and continuing to date, assert that Wild Wonder was still bound to provide VJUS the benefits of the Agreement, without acknowledging that bans on non-essential travel precluded Wild Wonder from realizing the benefits of its bargain.

The law does not entitle VJUS to absolutely and irreversibly bind Wild Wonder to a contract which had become one-sidedly "frustrated," simply because VJUS stubbornly insisted that in the abstract, conceivably, it could still "provide" flights to a customer living in a country directed by all levels of government "generally, not to fly." and with potential penalties for whatever a "non-essential" instance of travel might later be determined to have been.  In April of 2020, there was no reliable timeframe in which any person, company, or government in the United States could project an end to the state of affairs which had arisen.

---

[1] Indeed, VJUS's "worst possible" scenario in April 2020 of another 30 days before return to normalcy was so misinformed that it highlights how Wild Wonder's purpose in entering into the contract was fundamentally "frustrated." *See* discussion, *infra* at pp. 7-10 (citing emails annexed as Exhibit 4).

This case is distinguishable from other cases more directly centered on "changed economic circumstances" where courts may previously have rejected a proffered "frustration" argument, but those cases are instructive insofar as the reasons for rejection in those cases are not present here. S*ee e.g., CAI Rail, Inc. v. Badger Mining Corp.*, 2021 U.S. Dist. LEXIS 32564, at *1 (S.D.N.Y. Feb. 22, 2021) (discussed and distinguished *infra* at pp. 15-24). The "frustration" in this case does not go simply to pecuniary, second-order "economic" effects, as has been the reason for dismissal of some other cases arguing for "frustration," but rather goes to the core purpose of the contract, *engaging in the taking of flights themselves*, that had been paid for without subjecting Wild Wonder's principal to potential criminal penalties for "non-essential" travel. Indeed, the *ad hoc* novelty, and resulting arguable imprecision of the Covid-related travel restrictions,[2] at that point in time constituted sufficient legal cause to deem the contract "frustrated." Wild Wonder would, to utilize the contract in any form "substantially" related to the original purpose, have had to engage in conduct in violation of the *law*, and the existing state of affairs had already substantially undermined and frustrated the contract.

As such, this case does *not*, at its core, present a party unwilling to pay a different price for a contractually-set service *but which* it was still "foreseeable" that it would use "substantially" as originally contemplated; rather, it presents a party faced with unforeseeable potential inability to *use, at all*, the service in any manner. To the extent VJUS was not obligated to agree to any

---

[2] The nature of "essential" versus "non-essential" trips, which trips qualified, at what time, and how such trips might be determined to be one or the other, and under which particular regime, demonstrates "[t]he zig-zag course" of Covid-related restrictions as experienced by the country at large. *See Brach v. Newsom*, 6 F.4th 904, 920 (U.S. 9th Cir. 2021) (discussing California's restrictions specifically); *see also Seaplane Adventures v. Cty. of Marin*, No. C 20-06222 WHA, 2021 U.S. Dist. LEXIS 214648, at *10-12 (N.D. Cal. Nov. 5, 2021) (discussed *infra* at pp. 13-17, and elaborating upon inconsistent, changing, and conflicting directives all issued within single California County within the period of March through May 2020, but which were threatened to be enforced by county officials, against a company providing recreational flight services, on the basis that "**non-essential flights had to cease**" but that "essential" flights such as for flying "healthcare workers, **as _opposed_ to vacationers, to Tahoe**" might still be permissible).

particular modification, and indisputably did not do so, then the only appropriate legal remedy based upon the facts and as of the moment of that refusal is to deem the contract unenforceable and rescinded. As such, Defendants respectfully submit that summary judgment to declare that the contract at issue was "frustrated," and therefore void, is appropriate, as set forth below.

## STATEMENT OF FACTS

The pertinent facts of this matter are summarized in the Declaration of David J. Mahoney dated July 22, 2022, and the exhibits[3] annexed thereto (the "Mahoney Dec."), but are more fully set forth as follows:

### 1. Wild Wonder and the Limas Generally

Defendant Wild Wonder is a limited liability company which was established by Mr. Paulo Lima ("Mr. Lima"). To conduct business and personal affairs, Mr. Lima has flown by private jet for several years. Wild Wonder was set up in 2018 to manage Mr. Lima's ongoing travel arrangements, and in the course of same, on April 30, 2018, entered into a certain "Flight Solutions Program" (the "Agreement") with VistaJet US, Inc. ("VJUS"). At all relevant times, Mr. Lima was a resident of California.

### 2. VistaJet US Generally

---

[3] As further referenced and cited throughout this memorandum, the exhibits to this motion, as annexed to the Mahoney Declaration and made a part thereof by reference, are as follows:
- Mahoney Decl. at ¶5, annexed as **Exhibit 1**, the Transcript of the March 28, 2022 Deposition of Paulo Lima (cited hereinafter and throughout as the "Lima Dep.")
- Mahoney Decl. at ¶6, annexed as **Exhibit 2**, the Transcript of the December 16, 2021 Deposition of Leona Qi (cited hereinafter and throughout as the "Qi Dep.")
- Mahoney Decl. at ¶7, annexed as **Exhibit 3**, the Flight Solutions Program Agreement dated April 30, 2018 (cited hereinafter and throughout as the "Agreement")
- Mahoney Decl. at ¶8, annexed as **Exhibit 4**, Emails Previously Marked as Exhibits 10, 12, 13, and 14 to the Qi Deposition (cited hereinafter and throughout as the "March/April 2020 Emails")
- Mahoney Decl. at ¶9, annexed as **Exhibit 5**, the "Health Declaration Form – COVID-19" Marked as Exhibit 11 to the Qi Deposition (cited hereinafter and throughout as the "Health Waiver")
- Mahoney Decl. at ¶10, annexed as **Exhibit 6**, the "Executive Department State of California Executive Order N-33-20 (cited hereinafter and throughout as the "Stay at Home Order")
- Mahoney Decl. at ¶11, annexed as **Exhibit 7**, the United States Department of Homeland Security "Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response" dated March 19, 2020 (cited hereinafter and throughout as the "March 19 DHS Memo").

VJUS is a domestic corporation registered in Delaware with a headquarters and principal place of business in New York. (Deposition of Leona Qi ("Qi") dated Thursday, December 16, 2021, (the "Qi Dep." 22: 11-13)).  VJUS maintains a sales office in New York, and has salespeople present in "different states" including a service team in Ft. Lauderdale, Florida (Qi Dep. 26: 15-19). It is owned by a corporate parent, Vista Global ("VG"), as sole owner of VJUS. (Qi Dep 18: 3-12). Vista Global is, in turn, owned by Vista Global Holdings Group ("VGH"), incorporated in Dubai, run by chairman and founder, Thomas Flohr ("Flohr"). (Qi Dep. 18: 8-17). VGH became the parent of VJUS in or around approximately 2018. (Qi Dep. 22: 15-23). Aside from VJUS, VG owns in whole or in part a number of other subsidiaries, including Apollo Jets ("Apollo"), XO ("XO"), XO Jet Aviation, Inc. ("XOJA"), VistaJet Limited ("VJ Ltd"), Red Wing Aviation ("Red Wing"), and Talon Air ("Talon"). (Qi Dep. 18-19: 20-25; 1-6). The designated corporate representative of VJUS for this case is Ms. Leona Qi ("Qi"). At hiring, her title was President of Sales for the Asia Pacific Territory. (Qi Dep. 23: 1-3). Between May and September of 2018, Qi transitioned into a new role as President of Sales at VistaJet U.S., Inc. (Qi Dep. 23: 7-16). In this new role, her primary responsibility was to manage sales of the "flight solution program" ("FSP"), which is and remains VJUS's subscription-based program for customers. (Qi Dep. 24: ln 2-13). On October 1, 2021, Qi became an employee of VistaJet Limited International ("VJLI"), with the title of President of Sales of VistaJet Limited. (Qi Dep. 24: 16-23).[4] At that time, Qi ceased to be an employee of VJUS. (Qi Dep. 24: 25).

---

[4]  VJLI's relationship to VJUSA is that VJLI is the service provider to VJUS and operates a fleet of aircrafts. (Qi Dep. 25: 20-25). Operationally, VJUS operates independently, with its own revenue, and as president, Qi would meet with "the finance group, the CFO of VistaJet [Global] Holdings, as well as the chairman and founder" for the purpose of reporting whether VJUS met its sales targets. (Qi Dep. 27: 3-16). Qi did not otherwise receive directives or oversight on how to run the company. Other than Qi, VJUS had one other officer and director of whom Qi is aware, Brian Van der Meer ("Van der Meer"). (Qi Dep. 27: 17-23; 28: 10-12). Van der Meer is an outside independent director and is an authorized signatory for VJUS contracts. (Qi Dep. 28: 2-9).

2814040v2 / 068088.2 / WBERGESCH

VJUS does not operate any aircraft itself. (Qi Dep. 26: 1-3). All aircraft used by VJUS are operated by VJLI, XOJA, or a different company known as Reliance Aviation ("Reliance"), based in India. (Qi Dep. 26: 4-13). VJUS is not an "air carrier" and does not have an "ALC," or, a particular license issued by the FAA for air carriers. (Qi Dep. 33-34). VJUS is a service provider and does not own any aircraft, or any other assets. (Qi Dep. 34: 2-10). VGH, in contrast, does own the aircraft which it permits VJUS to use as a service provider (Qi Dep. 34: 11-25).[5] VGH has, according to Qi, and as of around March 28, 2022, a fleet of approximately 160 aircrafts. (Qi Dep. 35: 6-9). Similarly, VJUS does not employ any aircraft pilots, or flight crews; pilots are provided to customer users of VJUS's service only indirectly, through the employers of the respective pilots, which are employed by the respective entities operating the aircraft used in each particular instance of a client utilizing VJUS's service. (Qi Dep. 36-37). VJUS contends that its only "employees" are business operations personnel, such as sales, finance, officer managers, and IT. (Qi Dep. 37: 7-10).

### 3. The "Flight Services Agreement" Generally

The Agreement, generally, provided that Wild Wonder contracted to pay for a minimum 150 aircraft flight hours per year on private jets, at a rate of $13,250 per hour, subject to certain potential modifications set forth more fully in the Agreement and VJUS contracted to arrange private flights for Wild Wonder. (*See* Agreement, **Ex. 3**, "Key Commercial Terms" at pp. *1-6) The Agreement is governed by New York Law.  The Agreement had a term of three years, beginning upon the execution date of April 30, 2018, but providing for a limited "Early Exit" opportunity.

---

[5]  "Q: Does Vista Global Holdings own any Aircraft? A: Vista Global Holdings, yes." "Does VistaJet U.S. utilize the aircraft that are owned by Vista global Holdings? [. . .] A: Yes, it does."

2814040v2 / 068088.2 / WBERGESCH

The Agreement contains a "Force Majeure" provision. (Agreement, p. *8, §4). That provision reads in full:

> VistaJet US shall notify the Member of any event of Force Majeure as defined in the Carrier's [General Terms and Conditions of Carriage] impeding VistaJet US's ability to arrange Flight Services with the Program Aircraft for a period of 90 days or more, during which time the Member's obligations under this Program shall be suspended until VistaJet US is able to fulfil its obligations hereunder. Where the Force Majeure event continues beyond such 90 days, the Member may terminate this Program with immediate effect and funds shall be refunded as set forth above in Section 2 of Further Provisions

(*Id*).

The Agreement further provides that the occurrence and continuation of insolvency, bankruptcy, assignment for the benefit of creditors, failure to pay proper amount due, and material breach of any other provision of this Program will constitute an "event of default." (*Id.* at p. 8, §5). Under the agreement Wild Wonder was to make 12 quarterly payments to Plaintiff, each in the amount of $496,875. (Qi Dep. 13: 18-25).

Mr. Lima had extensive discussions with VJUS prior to the Agreement, to ensure that VJUS was the right fit for Mr. Lima. (Lima Dep. 87: 7-16). Mr. Lima discussed with VJUS several times his purpose for retaining their flight services. (Lima Dep. 87: 7-16). As a result, VJUS was well-versed in all aspects of Mr. Lima's intended use of these flight services. (Lima Dep. 87: 17-25). VJUS was aware of Mr. Lima's flight patterns, and that the use of these flights would be mainly for work-based travel and pleasure. (Lima Dep. 88: 2-12).

### 4. *Events of March-April 2020*

On March 4, 2020, Governor Gavin Newsom declared a State of Emergency to exist in California as a result of the threat of Covid-19, and on March 19, 2020, issued the Stay-At-home Order. (*See* **Ex. 6**). VJUS imposed Covid-related modifications and requirements to their flights in March 2020 due to the ongoing travel warnings issued by the CDC and the World Health

7

Organization. (Qi Dep. 131: 3-15).  The Stay-At-Home Order directs, "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors." (**Ex. 6**).  The Stay-At-Home Order further referred to and referenced the March 19 DHS Memo, as providing the basis for the state's "consistent" directives in connection with the identification of essential persons, activities, and services necessary to preserve to the extent possible. (**Ex. 7**). Modifications to the use of the services set forth in the Agreement which transpired in response to the Stay-At-Home Order included the sudden introduction of the Health Waiver form, which was a health declaration form that Mr. Lima was required to sign. (*See generally,* **Ex. 5**; *see also* Qi Dep. 132: 16-18).  Leona Qi testified both that the domestic service providers did not require a health declaration form, and that VJUS's domestic service provider required Mr. Lima to sign a health declaration form for his domestic flight. (Qi Dep. 133: 24-25). No part of the Agreement contemplated or referenced any such imposition of a "Health Waiver" as a condition upon the usage of the flight service. The Health Waiver form, by its own terms, was imposed because of, the COVID-19 Pandemic.

When Gov. Newsom issued the Stay-At-Home Order, Mr. Lima had 56.54 hours of flight time remaining on his account from his January 2020 payment. (Lima Dep. 22: 16-17). Mr. Lima contacted the plaintiff on March 17, 2020, about his inability to use the remaining flight hours due to the Stay-At-Home Order and related travel warnings, and to ensure that the flight hours would not be lost if he was unable to use them during the contract year. (*See generally,* March/April 2020 Emails, **Ex. 4**; *see also* Lima Dep. 22: 11-21).

Although Mr. Lima's business obligations for which he intended to use these flight hours were cancelled due to the hazardous travel conditions, Mr. Lima still had an upcoming need to take an essential flight with VJUS from California to North Carolina for the birth of his son. (Lima

2814040v2 / 068088.2 / WBERGESCH

Dep. 19: 20). Mr. Lima intended to fly from California to North Carolina in April 2020. (Lima

Dep. 25: 12-15).  Following Mr. Lima's request for a flight, the plaintiff required that Mr. Lima

sign a health declaration form.[6] (Lima Dep. 25: 3-5).  Mr. Lima was informed by the plaintiff that

if the health declaration form was not signed, VJUS would not provide the necessary flight

services. (Lima Dep. 25).  Mr. Lima recognized that he would need to sign this form for both the

outbound and inbound flights, however he could not certify that he had not been exposed to Covid-

19 conditions for the return flight because he would have been in a hospital in North Carolina for

the birth of his son. (Lima Dep. 28-29: 19-25).  VJUS then notified Mr. Lima that they would be

unable to have a flight ready for the time that was requested. (Lima Dep. 31: 5-10). Due to the

emergency circumstances and the VJUS's refusal to provide flight services, Mr. Lima was forced

to secure a flight with a separate entity only hours prior to the birth of his son. (Lima Dep. 33: 20-

23).

Between March of 2020 and April of 2020, Qi and Mr. Lima continued to engage in

discussions pertaining to the Agreement. (*see generally,* **Ex. 4**, March/April 2020 Emails). Mr.

Lima, understanding the seriousness of the global health crisis, contacted Qi on March 17, 2020

and specifically inquired about whether his flight hours could be rolled over into the following

year. (*Id.* at pp. *4-5). Qi responded on March 17, 2020 and acknowledged, "***we will never take***

***away hours from our customers when the situation is outside one's control (health, permit***

***issues, etc.)***" and ensured that Mr. Lima's flight hours would be rolled over into the following

year. (*Id.*) (emphasis added).

---

[6] The health declaration form was distributed by the member services team employed by VJUS. (Qi Dep p. 137, ln 22-25).  The form required Mr. Lima to state that he had not been in a hazardous location or potentially infected with or experienced an outbreak of the Covid-19 virus or similar illness. (Lima Dep. p. 27, ln 5-16).

9

Following this discussion, on March 30, 2020, VJUS sent Mr. Lima a request for Wild Wonder's year 3 quarter 1 payment, due April 30, 2020. (*Id.* at pp. *1-2). Discussions continued to follow, and on April 10, 2020, Qi again acknowledged the difficulty of the situation and allowed Mr. Lima a 6-month extension to make payments. (*Id.* at pp. *7-10).

Despite Mr. Lima's efforts, VJUS declined to actually terminate the Agreement or amend the Agreement to allow Wild Wonder to extend its window to use already paid for flight hours. Moreover VJUS did not consider the Agreement to have ever been formally terminated, and if terminated at all, only terminated upon initiation of the instant legal action. (Qi Dep. 109-116).

Nevertheless, VJUS's representative did not dispute that the impact of COVID, and, particularly, the government regulations and restrictions imposed, impacted Wild Wonder's use of the flight services generally provided for in the Agreement. (Qi Dep. 119-120). VJUS also acknowledged that their own service providers were impacted and obliged to follow government restrictions and regulations, and that VJUS itself was beholden to any conditions imposed by its service providers. (Qi Dep. 126-127; 132). VJUS acknowledged that their customers' ability to utilize the flight services bargained for in the Agreement severely impacted by the rules and restrictions caused by COVID. (Qi Dep. 126-127; 132). Nevertheless, VJUS posited that because it was not VJUS, but the carrier whose adherence to any rules or restrictions controlled, VJUS was not themselves culpable for the possibility that a passenger flying pursuant to the VJUS Agreement may be told "you cannot fly[.]" (Qi Dep. 134, 13-21; 135, 6-24).

## APPLICABLE STANDARDS

Wild Wonder seeks summary judgment upon a declaratory judgment cause of action. Under the Declaratory Judgment Act, §28 U.S.C. 2201, a court may "in a case of actual controversy within its jurisdiction[,] . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Embraer S.A.*

10

*v. Dougherty Air Tr., LLC*, 348 F. Supp. 3d 246, 255 (S.D.N.Y. 2018). The standard on summary judgment with respect to a declaratory judgment is the same as that provided generally by FRCP Rule 56. *See Embraer S.A.*, 348 F. Supp. 3d at 255.

Rule 56 "authorizes a court to grant summary judgment if the movant establishes that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Haskins v. Doe*, No. 16-CV-8525 (RA), 2019 U.S. Dist. LEXIS 150614, at *4-5 (S.D.N.Y. Sep. 4, 2019) (Abrams, J.) (internal citations and quotation marks omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Overseas Private Inv. Corp. v. Gerwe*, No. 12-CV-5833 (RA), 2016 U.S. Dist. LEXIS 40752, at *15 (S.D.N.Y. Mar. 28, 2016) (Abrams, J.) (citing *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015)). "When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is 'a genuine issue for trial." *Johnson v. AGS CJ Corp.*, No. 17-CV-7438 (RA), 2020 U.S. Dist. LEXIS 61451, at *21-23 (S.D.N.Y. Apr. 7, 2020) (Abrams, J.) (internal quotation marks omitted) (citing *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)).

In cases presenting questions of contract interpretation, the court must "interpret [a] contract to give effect to the intent of the parties as expressed in the clear language of the contract . . . . Words and phrases in a contract are to be given their plain meaning and the contract is to be construed to give full meaning and effect to all of its provisions." *Am. Commercial Lines LLC v.*

*Water Quality Ins. Syndicate*, 679 F. App'x 11, 14 (2d Cir. 2017) (internal quotation marks and citations omitted); *see also Johnson*, 2020 U.S. Dist. LEXIS 61451, at *22-23.

   "Under New York law, the doctrine of [. . .] frustration of purpose, discharges a party's duties to perform under a contract where an unforeseen event has occurred, which, in the context of the entire transaction, destroys the underlying reasons for performing the contract, even though performance is possible." *Sage Realty Corp. v. Jugobanka, D.D.*, 95 Civ. 0323 (RJW), 1997 U.S. Dist. LEXIS 9301, at *5 (S.D.N.Y. July 2, 1997) (internal quotation marks omitted); *see also Gander Mt. Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 359 (N.D.N.Y. 2013). In application, "frustration" functions such that where "[b]oth parties can perform but, as a result of unforeseeable events, performance by party *X* would no longer give party *Y* what induced him to make the bargain in the first place. Thus frustrated, *Y* may rescind the contract. Discharge under this doctrine has been limited to instances where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party." *United States v. Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974). Courts sitting in New York have frequently looked to the Restatement of Contracts (Second) for additional guidance on the application of the doctrine, and observed:

> First, the purpose that is frustrated must have been a principal purpose of that party in making the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made.

*Gander Mt. Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 359 (N.D.N.Y. 2013).

## ARGUMENT

Wild Wonder is entitled to summary judgment on its first cause of action for declaratory judgment. No factual issues exist with respect to whether: (i) the COVID-19 pandemic frustrated Wild Wonder's purpose of entering into the Agreement such that it should have been excused from performance; and (ii) that as a result of some or all of the foregoing, that declaratory judgment is appropriate at this time to rule that the Agreement is either unenforceable, or rescinded.

## I.    DECLARATORY JUDGMENT IS APPROPRIATE BASED UPON "FRUSTRATION OF PURPOSE"

The undisputed facts demonstrate that summary judgment to declaring that the COVID-19 pandemic frustrated the purpose of the Agreement is appropriate. The global COVID-19 pandemic and the resulting restrictions on non-essential travel, constituted a "virtually cataclysmic, wholly unforeseeable event" that rendered the Contract valueless to Wild Wonder. *NTS W. USA Corp. v. 605 Fifth Prop. Owner, LLC (In re NTS W. USA Corp.)*, No. 20-CV-6692 (CS), 2021 U.S. Dist. LEXIS 171240, at *13 (S.D.N.Y. Sep. 9, 2021) (citing to *United States v. Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974)). ;  *A + E TV Networks, LLC v. Wish Factory*, No. 15-CV-1189 (DAB), 2016 U.S. Dist. LEXIS 33361, at *38 (S.D.N.Y. Mar. 11, 2016) ("[T]he doctrine is a narrow one which does not apply 'unless the frustration is substantial.") (internal quotation marks omitted) *and In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 839 (Bankr. S.D.N.Y. 2020).  The several federal, state, and local "stay and home" orders and other restrictions, many of which *directly and specifically* related to travel for "non-essential" reasons, and with potential enforcement penalties for disobedience, constituted a "substantial" impediment to the "purpose" originally contemplated by a contract to secure guaranteed hours in a private jet. Such impediments were entirely unforeseeable prior to the COVID pandemic, and yet they immediately subjected Wild Wonder to strictures and prohibitions that "so completely [frustrated] the basis of

13

the contract that, as both parties understood, the transaction would have made little sense." *See NTS*, 2021 U.S. Dist LEXIS 171240, at *13

    **i.**    ***The Effects of the COVID-19 Pandemic Were both "Unforeseeable" and "Substantially" Destroyed or Undermined the Agreement's Purpose for One of the Contracting Parties***

It is beyond dispute that the rise of COVID and its ramifications for life throughout the United States in April of 2020, were wholly unforeseeable.  "When the pandemic began in early 2020, governments at all levels struggled to respond to the virus. With little known about its origin, spread, or possible cure, panic ensued and daily in-person life crumbled. Worse, over six million people have died in COVID-19's short and unpredictable existence. The United States alone has had approximately 85 million cases and over one million deaths. Even as death tolls have slowed, the virus's severe impact remains." *Sunstone Hotel Inv'rs v. Endurance Am. Specialty Ins. Co.*, No. SACV 20-02185-CJC(ICESx), 2022 U.S. Dist. LEXIS 111147, at *1-2 (C.D. Cal. June 15, 2022). The resulting federal and local "shutdown" orders and Stay-At-Home orders demonstrably frustrated any possibility of either party imposing the original terms and obligations of the contract upon the other, in any manner similar to that originally contemplated.

The above is consistent with the account of events given by the whole of Mr. Lima's deposition. *See generally*, **Exhibit 1**. Mr. Lima resides in the State of California. (Lima Dep. 6: 10-11). VJUSA was aware of this from the inception of the contract. (Lima Dep. 87: 17-25). Over a month before the first disputed attempt to schedule a flight at issue in this case, which occurred in approximately early April, "[i]n March 2020, President Trump proclaimed a state of emergency from Covid 19." *Culinary Studios, Inc. v. Newsom*, 517 F. Supp. 3d 1042, 1049 (E.D. Cal. 2021).[7]

---

[7] Even prior to that, also in March of 2020, "the World Health Organization declared COVID-19 a global health pandemic, and the CDC issued guidance restricting gatherings of individuals in an attempt to stop the spread of the

2814040v2 / 068088.2 / WBERGESCH

Also beginning in March of 2020, California's respective "Covid Response" had proceeded as follows:

> Governor Newsom declared a state of emergency on March 4, 2020, and, on March 19, 2020, he signed Executive Order N-33-20. Executive Order N-33-20 directed all California residents "to immediately heed the current State public health directives," which were concurrently issued by the California Department of Public Health ("CDPH"). Exec. Ord. N-33-20. Those directives, issued by the State Public Health Officer and Director of the CDPH, "***order[ed] all individuals living in the State of California to stay home or at their place of residence*** except as needed to maintain continuity of operations of the federal critical infrastructure sectors[.]" The federal government had identified 16 critical infrastructure sectors "whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. Accordingly, the CDPH Director "order[ed] that Californians working in these 16 critical infrastructure sectors may continue their work[.]" ***[T]he governor made violation of Executive Order N-33-20 punishable as a misdemeanor. see Cal. Gov't Code § 8665***.

*See Mission Fitness Ctr., LLC v. Newsom*, No. 2:20-CV-09824-CAS-KSx, 2021 U.S. Dist. LEXIS 89055, at \*5-6 (C.D. Cal. May 10, 2021) (internal citations omitted)(emphasis added); *see also Vida Skin Care, Inc. v. Sentinel Ins. Co.*, No. 2:21-cv-07997-MCS-SK, 2022 U.S. Dist. LEXIS 82670, at \*3-4 (C.D. Cal. May 6, 2022);[8] *compare Common Sense Party v. Padilla*, 469 F. Supp. 3d 951, 956 (E.D. Cal. 2020) (case in 2020 highlighting specific "stay home" requirements of Order N-33-20). Localities below the state level also issued their own orders. Only in June 2021

---

virus through surface transmission and through the air." *Protégé Rest. Partners LLC v. Sentinel Ins. Co.*, 517 F. Supp. 3d 981, 984 (N.D. Cal. 2021).

[8] ("Due to the COVID-19 pandemic, California Governor Gavin Newsom issued an executive order on March 12, 2020, directing California residents to cancel large nonessential gatherings. On March 15, 2020, Los Angeles Mayor Eric Garcetti issued an executive order directing all nonessential businesses to be closed in Los Angeles. On March 19, 2020, Governor Newsom issued an executive order requiring all individuals living in the State of California to stay home or at their place of residence except as needed for essential services and to engage in strict social distancing. On the same day, Los Angeles issued an order stating that the COVID-19 virus 'is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time.'").

2814040v2 / 068088.2 / WBERGESCH

was the N-33-20 "Stay-At-Home" order formally revoked in California by Order N-07-21. *See Brach v. Newsom*, 6 F.4th 904, 914 (U.S. 9th Cir. 2021).

As set forth in his deposition, Mr. Lima was subject to non-essential travel restrictions in April of 2020, which prohibited his use of hours secured by the Agreement. (Lima Dep. 37: 7-16). Within the state of California, limitations on gatherings and non-essential travel were both restrictive and aggressively enforced. For example, in the case *Seaplane Adventures v. Cty. of Marin*, a single California County within period of March through May 2020 not only issued, but threatened to enforce two separate – both vaguely written – restrictions concerning "non-essential" activities and travel, against a company providing recreational flight services; in the course of doing so, the enforcement authorities proceeding against the company for violations, on the basis that "***non-essential flights had to cease***" but that "essential" flights such as for flying "healthcare workers, ***as <u>opposed</u> to vacationers, to Tahoe***" might still be permissible. *See Seaplane Adventures v. Cty. of Marin*, No. C 20-06222 WHA, 2021 U.S. Dist. LEXIS 214648, at *10-12 (N.D. Cal. Nov. 5, 2021).

As of April 2020, California's the Stay-At-Home Orders left Wild Wonder with the untenable choice of potentially violating the law by scheduling "non-essential" flights, or complying with the Stay-At-Home Oder, thereby frustrating the core purpose of the Agreement.[9] That the Agreement did not contemplate the distinction between "essential" and "non-essential" travel supports Wild Wonder's argument that the impact of the pandemic upon this Agreement was indeed "unforeseeable."

---

[9] VJUS's representative indicated that VJUS was not prohibited from *providing* flights (Qi Dep. 120: 7-10). However, this bears no relation to whether as an individual subject to the various federal, state, and local orders and restrictions, Mr. or Mrs. Lima were, in the event they attempted to fly, doing so on a permissible basis.

16

ii.     **The Law Recognizes the Force and Effect of Government Intervention to "Frustrate" A Private Contract, and The Court Should Do So Here Based On the Facts**

Intertwined with the inherent "unforeseen" and "substantial" frustration of Wild Wonder's purpose of entering into the Agreement, are the particular orders and restrictions which were enacted, and which pertained to travel. The restrictions on non-essential travel have been recognized as supporting judicial consideration of whether a private contract has been "frustrated". In *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, the Second Circuit addressed not only the magnitude, scope, and impact of COVID itself, but upon the impact of the related government orders and restrictions. Specifically, the Second Circuit said:

> Here, the COVID-19 pandemic, coupled with the state government's orders restricting the activities of nonessential businesses, constitute an occurrence beyond the parties' reasonable control, allowing Phillips to end the Stingel Agreement. The pandemic and government shutdown orders are the same type of events listed in the force majeure clause, which include, "without limitation," natural disaster, terrorist attack, and nuclear or chemical contamination. App'x at 60 ¶ 12(a). Each of the enumerated events are of a type that cause large-scale societal disruptions, are beyond the parties' control, and are not due to the parties' fault or negligence. By contrast, JN's argument would render meaningless both the catchall phrase and the force majeure clause's explicit statement that the non-exhaustive list of events following the catchall phrase did not limit it. *See* App'x at 60 ¶ 12(a). This would violate the principle of New York contract law that any interpretation "that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (internal quotation marks omitted).

*JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 124 (2d Cir., March 23, 2022).

*JN* involved the operation of a "force majeure" clause, which is not part of Defendant's instant motion. However other courts have applied similar reasoning outside the "force majeure" context. *See, e.g.*, *Brown v. Webber*, No. 18 CV 09618 (NSR), 2022 U.S. Dist. LEXIS 69374, at *9 (S.D.N.Y. Apr. 14, 2022) (in context of delay and failure to prosecute claims in personal injury action, observing "[t]he Court is aware of the huge problems posed by the Pandemic. As the Second Circuit has stated, '*the COVID-19 pandemic, coupled with the state government's orders*

17

*restricting the activities of nonessential businesses, constitute an occurrence beyond the parties'*

*reasonable control*..., [t]he pandemic and government shutdown orders are the same type ...which

include, 'without limitation,' natural disaster, terrorist attack, and nuclear or chemical

contamination. Each of the enumerated events are of a type that causes large-scale societal

disruptions, are *beyond the parties' control*, and are not due to the parties' fault or negligence.'")

(emphasis supplied) (citing *JN Contemp. Art LLC*). This Court's own colleagues expressly

observed, in *Brown*, that "[t]he period following March 2020, the Pandemic can only be described

as constituting extraordinary circumstances." *Brown*, 2022 U.S. Dist. LEXIS 69374, at *9 (in

context of Rule 60(b)(6) application). This Court should adopt the reasoning of the *Brown* and *JN*

*Contemp. Art LLC* Courts in considering Wild Wonder's "frustration" argument.

New York state courts have ruled in a manner consistent with the Second Circuit's holdings

that COVID restrictions promulgated by state executives could constitute "circumstances beyond

[. . .] reasonable control" in appropriate cases. *See, e.g.*, *850 Third Ave. Owner, LLC v. Discovery*

*Commc'ns, LLC*, 2022 NY Slip Op 03171, ¶ 1 (1st Dept. May 12, 2022) (citing and applying the

*JN Contemp. Art LLC*, holding and context of New York's governor's orders issued). New York

orders analogous to those promulgated in California and directly at issue here have been held to

be "extraordinary" and "transcend[ed] the normal and even emergency type of events that one

could reasonably anticipate[.]" *Matter of City of Troy (Troy Uniformed Firefighters Ass'n, Local*

*86 IAFF, AFL-CIO)*, 2022 NY Slip Op 02174, ¶¶ 2-3, 203 A.D.3d 1523, 1525-26, 166 N.Y.S.3d

285, 287-88 (3rd Dept. March 31, 2022) (context of workplace measures applied to the "propriety

of the Governor's decision to implement such order" and the question of whether petitioner was

"obligated to comply") (also citing *JN Contemp. Art LLC*).

COVID is not the first national emergency to prompt governmental restrictions that unexpectedly frustrated the purposes of private contracts. Seventy years ago, against the backdrop of World War II, the Second Circuit held:

> Whether or not these authorities go so far as to state a definitive rule of preferred interpretation, they do certainly suggest that, where the external circumstances present a case for the fair operation of a rule excusing performance, that shall not be denied unless the fault in not providing against it seems clear and unilateral. We think the court below placed too heavy a burden upon the defendant and that fairness and justice require the acceptance of the excuse as being both compelling and beyond the terms of the defendant's obligation, properly considered. Several circumstances lead to this conclusion.

*L. N. Jackson & Co. v. Royal Norwegian Gov't*, 177 F.2d 694, 699 (2d Cir. 1949). The Second Circuit clarified that "the dramatic and unexpected nature of the crisis following upon Pearl Harbor" and the other facts set forth in its opinion weighed forcefully in favor of setting aside certain private contracts affected by the Government's emergency and wartime measures, which interfered with private contracts, holding "it is well settled that a contractual duty is discharged, in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty, ***where performance is subsequently prohibited by an administrative order made with due authority by an officer of the United States***." *L. N. Jackson & Co. v. Royal Norwegian Gov't*, 177 F.2d 694, 697 (2d Cir. 1949) (emphasis added). Even more forcefully, the court also stated that it was the "nature of the *governmental crisis* which was the direct cause of the *mandates*" at issue in the lawsuit, *L. N. Jackson*, 177 F.2d at 700, and "[t]he risk of such government action ***is not one that the owner has agreed to bear***, even in the absence of a force majeure clause; and it is not one that by common practice and opinion he should be required to bear." *L. N. Jackson*, 177 F.2d, 700-01. Citing *Mawhinney v. Millbrook Woolen Mills*, 231 N.Y. 290, 299-300 (1921) (a seller who yielded to a government directive issued due to the emergency of World War I and which forced him to *cancel his other private contracts* was to be "exonerated"

rather than liable for nonperformance.) This Court can look to *L. N. Jackson* and *Mawhinney* for guidance on how to handle the impact of the government directives not to travel and how those directives frustrated the purpose of the contract.

### iii.    *Mere Economic "Changed Circumstances" Frustration Cases Distinguished*

Frustration of purpose does *not* apply simply where there is "a change in market conditions or an increase in the cost of performance[;] [q]uite a bit more is required than demonstrating a desire to avoid the consequences of a deal gone sour." *See Health-Chem Corp. v. Baker*, 737 F. Supp. 770, 776 (S.D.N.Y. 1990). To be clear however, mere economic reasons are not solely at issue in connection with why Wild Wonder found its original reasons for entering into this Agreement frustrated. The imposition of travel restrictions parsing whether particular trips or instances of travel during the period at issue here were "essential" or "unessential" frustrated the Agreement to the extent Wild Wonder and Mr. Lima were, in complying with the unforeseeable directives contained in the several lockdown and Stay-At-Home orders, frustrated from undertaking what would otherwise have been the ordinary travels contemplated by the Agreement as originally entered.

In *Structure Tone, Inc. v. Universal Servs. Grp., Ltd.*, the court held that the frustration of purpose doctrine may prevail "when an inducing circumstance of the contract ceases to exist." *Structure Tone, Inc. v. Universal Servs. Grp., Ltd.*, 2010 NY Slip Op 31384(U), ¶ 15 (Sup. Ct. NY, June 3, 2010) *aff'd* 87 A.D.3d 909 (1st Dept 2011). Here, the state of affairs as of April 2020, including the government-imposed restrictions, unequivocally demonstrate that the "inducing circumstance" of the contract – the ability to fly for any reason, or no reason, *had been substantially altered*, and did not exist for the continued usage of the contract in a manner consistent with that purpose. *Accord Gander Mt. Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 359 (N.D.N.Y. 2013) ("[T]he doctrine of frustration of purpose discharges a party's duties to

2814040v2 / 068088.2 / WBERGESCH

perform under a contract where an unforeseen event has occurred, which, in the context of the entire transaction, destroys the underlying reasons for performing the contract, even though performance is possible.") (internal quotation marks omitted). Other New York courts have reached similar holdings. *See, e.g.*, *W. K. Ewing Co. v. N.Y. State Teachers' Ret. Sys.*, 14 A.D.2d 113, 115, 218 N.Y.S.2d 253, 255 (3rd Dept. 1961) (holding it is "implicit" in a contract of this sort "such a continuance of the entities *and of the subject matter dealt with* as to allow the *possibility* of performance") (emphasis added). Courts in New York have found the requisite "unforeseeability" and resulting frustration for events manifestly of lesser scope and magnitude, but no less "unforeseeable" than the COVID-19 pandemic, and indeed, have equitably set aside contracts based upon frustration of purpose for unforeseeable circumstances on facts presenting merely an insurance carrier's withholding of payment on a corporations claim in connection with a premises, pending its decision to engage in an investigation for potential arson. *See generally, In re Fontana D'Oro Foods*, 122 Misc. 2d 1091, 1097, 472 N.Y.S.2d 528, 532-33 (Sup. Ct. Richmond, Dec. 22, 1983), *modified on other grounds*, 65 N.Y.2d 866 (1985) (court of appeals reinstating specific performance order, based on holding different form of transaction compelled different outcome).

The same related reasons as set forth above and demonstrated by *Structure Tone* and *Delshah* distinguish the *CAI Rail* case as well. In *CAI*, the party contending frustration which was rejected by the court was a rail carrier engaged in a contract "to lease rail cars" for the purpose of transporting, it appears, sand, which the carrier argued had been "destroyed" by various aspects of the COVID pandemic, but including both economic difficulty, and citation in the abstract to "government orders and regulations that have impacted daily life and [Defendant]'s performance." *See generally CAI Rail, Inc. v. Badger Mining Corp.*, 2021 U.S. Dist. LEXIS 32564, at *22

(S.D.N.Y. Feb. 22, 2021). In declining to accept the proffered "frustration" argument in *CAI* however, the court made two central observations: (1) that the defendant in CAI did not "mention" with "specificity" any discrete government order affecting the use of rail cars for Defendant's business, and (2) that (perhaps related to the inability to cite a specific intervening order) the proffered argument otherwise stood mostly upon the basis of "general economic consequences from the pandemic. *CAI Rail*, 2021 U.S. Dist. LEXIS 32564, at *22. For the above reasons, the court avoided determining whether the events of COVID "were foreseeable," "because it cannot be said that the foundation of the contract—to lease rail cars, even if only for the exclusive purpose of transporting sand—has been 'destroy[ed][.]'" *CAI Rail*, 2021 U.S. Dist. LEXIS 32564, at *23.

Neither of the shortcomings in *CAI* are present here. Wild Wonder here has pointed to, both as set forth in this Memorandum, *supra* at pp. 15-16, and in the deposition of Mr. Lima, the specific and operative orders in place during March and April of 2020, which indisputably applied to the activity which constituted, also indisputably, the substantial purpose of his Agreement with VJUS; *personal travel, largely for pleasure*. (**Ex. 6;** Lima Dep. 88: 2-12). Moreover, there is no suggestion in this case that Lima's April communications with VJUS reflected a change in his own financial wherewithal, and indeed, the totality of the undisputed deposition testimony belies that Lima's own financial ability to continue to fly privately was unaffected by the pandemic, to the extent indeed later in the pandemic, under different circumstances, Lima engaged in some flying activity using other carriers.

The distinction was *whether Lima was to be able to fly at all*, and as affected by the surrounding orders and restrictions, consistent with the original purpose of the contract, where in *CAI Rail*, the rail cars were not directly affected by operative orders or restrictions, and indeed were almost certainly covered at all times as "essential," only that the broader economic

22

circumstances rendered the Defendant less financially able to continue to pay to utilize the rail cars. Here, the individual and personal *purpose for taking a flight* became implicated, by operation of the orders and restrictions promulgated. Wild Wonder was not, as the *CAI Rail* Defendant *was*, simply at liberty to *continue* the same activities as before, economic wherewithal aside. Rather, Wild Wonder was *directly* obligated to not engage in "non-essential" travel, and by complying with such a directive, the intrinsic and basic purpose of the Agreement at issue here was substantially frustrated as a matter of law.

### iv.    *Equitable Considerations and Absurdity*

Finally, the Court should consider the implications of declining to rule, that this Agreement was "frustrated" by COVID, and expressly given the nature of the government mandates. Although words of contracts control in most cases, interpretation of those words is always subject to the caution that notwithstanding, "absurd results should be avoided." *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 104 (2d Cir. 2006); *see also Newmont Mines v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986). Here, by either the words of the contract, or the manifest basis why it was negotiated, the contractual payment for 150 hours of private flights is not rationally separable from a foundational assumption that the customer entering into such a contract would actually intend *to use most or all of those hours*. However, the undisputed fact of the intervening occurrence of COVID, and the nature and substance of the restrictions and governmental orders created the possibility – mid-stream – that it would become impossible for Wild Wonder to use any of the hours it paid for unless Mr. Lima was willing to *defy the law*. This is, Defendant submits, an absurd result.[10]

---

[10] *See Am. Commer. Lines LLC v. Water Quality Ins. Syndicate*, 679 F. App'x 11, 15 (2d Cir. 2017) ("A reasonable person could conclude that this could not have been what the parties intended").

2814040v2 / 068088.2 / WBERGESCH

Similarly, this Court need not accept that the onus of compliance and potential detriment in result of suffering the loss of pre-paid and contracted flight hours under the terms of an Agreement such as this one *is to fall, and could only fall upon the client, and not the party providing the service.* VJUS cites that it was, itself, "bound" to honor the respective COVID-instituted policies of its "carriers;" (QI Dep. 119: 14-21).  Indeed, VJUS's representative admitted at her deposition that VJUS would have declined to fly a client who, at the moment of flight, did not comply with *VJUS's own carriers' COVID policies.* (Qi Dep. 127: 8-10).  Absent application of the "frustration" doctrine, the only means of upholding this contract requires an effective finding that the terms of the contract apply even where the customer would be forced *to engage in proscribed travel to avoid the benefit of its bargain.* It is indisputably true that as of April of 2020, to reasonably utilize and not forfeit already-paid and yet-to-be-paid hours, Wild Wonder's principal would have been obligated to simply continue flying in violation of the Stay-At-Home Order.

2814040v2 / 068088.2 / WBERGESCH

## CONCLUSION

Whether or not VJUSA may have permitted some customer to be able to fly under circumstances set forth above, Wild Wonder's purpose of entering into the Agreement was indisputably substantially frustrated. There cannot reasonably be a factual dispute that the nature of the COVID-19 Pandemic was, as a matter of law, sufficiently unforeseen and all-encompassing so as to frustrate the essential basis of the Agreement as originally entered into, and that the manner in which it did so was sufficiently "substantial" so as to constitute frustration of purpose. As such, declaratory judgment is appropriate, and Wild Wonder is entitled to summary judgment declaring that the restrictions upon travel which were issued in or around March 2020 and for the next several months constituted sufficient basis to frustrate the Agreement with Plaintiff and that agreement is correspondingly unenforceable or rescinded.

Dated:  Jericho, New York
      July 22, 2022

                            **SILVERMANACAMPORA LLP**
                            *Attorneys for Defendant Wild Wonder LLC*

              By: _____
                  David J. Mahoney
                  A Member of the Firm
                  100 Jericho Quadrangle, Suite 300
                  Jericho, New York 11753
                  (516) 479-6300

2814040v2 / 068088.2 / WBERGESCH